UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
ALEXANDRU HOSSU,

       Plaintiff,                                                 **COMPLAINT**

vs.

COUNTY OF PUTNAM DONALD SMITH, WILLIAM
McNAMARA, PATRICK CASTALDO, STEPHEN
TRICINELLI,  FREDERICK GREEN, KENNETH
BORDEN

       Defendants.
-------------------------------------------------------x

    By and through his counsel, Michael Sussman, plaintiff complains of

defendants as follows:

**INTRODUCTION**

   1.  On March 20, 2013, defendants arrested plaintiff and accused him of

forcibly sexually abusing a minor. This allegation was false, and plaintiff's

resulting arrest, indictment and prosecution the result of the politically-inspired

acceptance of a baseless accusation made by a deeply troubled young woman who

defendants knew, and had every reason to know, was lying.

    Defendants failed to gain the slightest corroboration for her very serious

charge, but this did not deter them from arresting, indicting and prosecuting

plaintiff because of his known association with Adam Levy, then the sitting

1

District Attorney of Putnam County and a staunch opponent of defendant Smith and his effort to gain re-election in November 2013.

Defendants chose to arrest and ultimately indict Mr. Hossu without probable cause that any forcible sexual assault [or other violation of law] had occurred to further defendant Smith's collateral political purpose. While Mr. Hossu was ultimately exonerated at trial of any criminal offense, he suffered profound and lasting injury by dint of his false arrest and malicious prosecution and the abuse of process defendants demonstrated.

## PARTIES

2. Plaintiff Alexandru Hossu is a Rumanian citizen who resides within this judicial district, as he has at all relevant times.

3. Defendant Donald Smith is the Sheriff of Putnam County, resides within this judicial district, as he has at all relevant times, and is sued in his individual capacity for violating plaintiff's constitutional rights. Defendant County of Putnam is a municipal corporation which may sue and be sued, as here, for the unconstitutional policies and practices implemented by final policy-makers like defendant Smith. The County is within this judicial district.

4. Defendant William McNamara served as a Captain of the Civil Division and Records Custodian for the PCSD and a close paid adviser to defendant Smith,

resides within this judicial district, as he has at all relevant times, and is sued in his individual capacity for violating plaintiff's constitutional rights.

5. Defendant Patrick Castaldo served as a senior investigator for the Putnam County Sheriff's Department at all relevant times and resided in the County of Putnam. He is sued in his individual capacity for violating plaintiff's constitutional rights.

6. Defendant Stephen Tricinelli served as the lead investigator on this matter for the Putnam County Sheriff's Department and resided in the County of Putnam.  He is sued in his individual capacity for violating plaintiff's constitutional rights.

7. Defendant Frederick Green was a Senior Assistant District Attorney in and for the County of Westchester and assigned as lead prosecutor in this matter.  He resides within this judicial district and is sued in his individual capacity for violating plaintiff's constitutional rights.

8. Defendants Borden served as an Assistant District Attorney employed by the County of Westchester and is sued in his individual capacity for violating plaintiff's constitutional rights.  .

## **JURISDICTION**

9. As plaintiff alleges that, while acting under color of state law, each defendant violated his constitutional rights, this Honorable Court has jurisdiction pursuant to 28 U.S.C. sections 1331, 1343 (3) & (4) and 42 U.S.C. secs 1983 and 1988.

## STATEMENT OF FACTS

10.  On March 11, 2013, 15-year old S. called her ex-boyfriend, Kenny Mitchell, and said she was going to kill herself because girls in her school were posting derogatory comments about her on the internet.

Mitchell called 911 and told police he was concerned for S's safety.

11.     Putnam County Deputy Sheriff Michael Sutherland responded to the home of S. and found her unharmed and in good spirits.

12.     Within moments, S.'s aunt and legal guardian, Bebhinn Fahy, [hereinafter "Aunt B." arrived home and was told about S.'s call to Mitchell, Mitchell's call to 911, and the need for Sutherland to transport S to Putnam Hospital Center ("PHC") as an emotionally disturbed person ("EDP") for a full psychiatric evaluation.

13.     Prior to leaving the home, Sutherland was advised that S. recently told her school social worker and school resource officer ("SRO") that, on October 24, 2010, she was raped by her mother's ex-boyfriend, Alex Hossu.

14.     Aunt B. told Sutherland that she was told about S's rape claim by the school social worker and guidance counselor several days prior, but took no action since she questioned S.'s credibility and first wanted to discuss the story with Joanne Pollack, S.'s therapist, to determine the veracity of S's claim.

15.    In addition to being told that Aunt B. questioned the truthfulness of S.'s rape claim, Sutherland was also told that, after the rape, S. told her mother what had happened, and her mother also accused her of lying.

16.    Sutherland reported S.'s story to his sergeant and transported S. to PHC for a full psychiatric evaluation. Sutherland prepared a police report about S. and her story about being raped on October 24, 2010.

17.    On March 12, 2013, senior investigator Patrick Castaldo assigned Stephen Tricinelli to investigate S's October 24, 2010 rape allegation against Alex Hossu.

18.    On March 12, 2013, Tricinelli arrived at work, read Sutherland's police report from the night before, recognized S.'s name as a person he dealt with in the past and, in order to reacquaint himself with S., accessed the sheriff's computer database and located his old police report that detailed his involvement with S. on September 30, 2010.

19.    That incident report involved a claim S. made to school officials and the SRO in which she accused her mother of violently assaulting her.

20.    Tricinelli recalled that he interviewed S.'s mother, who denied S.'s violent assault claim, and he interviewed S., who signed a sworn statement that outlined the elements of assault and endangering the welfare of a child.

21.    Despite the sworn statement signed by S., Tricinelli did not arrest S.'s mother because he did not find S. to be credible.

22.     According to Tricinelli, S.'s story of being violently assaulted by her mother was contradicted by the lack of physical injuries one would expect to find if the story was true.

23.     Putnam County Child Protective Services (CPS) also investigated S.'s September 30, 2010 assault claim and, like Tricinelli, closed their case as "unfounded" because they did not find S. to be a credible witness.

24.     After refreshing his recollection about S. and her willingness to sign a sworn statement that falsely accused her mother of a serious crime on September 30, 2010, Tricinelli called Aunt B. to set up an interview with S at the Putnam County Child Advocacy Center (CAC).

25.     Aunt B told Tricinelli that she wasn't sure whether S. was telling the truth about the rape allegation, and that was why she first wanted to speak with S.'s therapist before doing anything.

26.     Despite the fact that S.'s therapist was on vacation and therefore, not available to meet with S., Aunt B. agreed to bring S. to the CAC on March 13, 2013 for an interview.

27.     On March 13, 2013, Tricinelli, CPS worker Marie Fabiano, and Putnam County Assistant District Attorney Laura Roberts, all members of the Multi-Disciplinary Team (MDT), arrived at the CAC to participate in the interview process.

28.     Tricinelli and Fabiano first interviewed Aunt B while ADA Roberts observed the interview from a closed circuit TV.

29.     Aunt B. told Tricinelli and Fabiano that in October 2012, she received a telephone call from Kenny Mitchell's mother who said that S. and Kenny had gone together to a homecoming event at Brewster high school (as boyfriend/girlfriend), and S. left Kenny and went with a group of boys under the bleachers at the football field. Kenny got concerned for S.'s well being and called his mother, who then called Aunt B.  Kenny's mother told Aunt B. that S. had previously told Kenny that her mother's ex-boyfriend, raped her.

30.     Concerned for S.'s safety, Aunt B. went to look for S., found her and told her about her conversation with Kenny's mother.

31.     S. denied that Alex raped her or touched her in an inappropriate manner.

32.     Aunt B. told Tricinelli and Fabiano that, about a week later, she revisited the subject with S. who, once again, denied that Alex raped her.

33.     In an effort to explain how S. would know about adult-subject matter like sexual intercourse and rape, Aunt B. told Tricinelli and Fabiano that S. "watched SVU (Special Victims Unit) like it was her job."

34.     At the end of her interview, Aunt B. told Tricinelli and Fabiano that Alex was the personal trainer for Judge Judy's son, Adam Levy.

35. After hearing that, according to Aunt B, plaintiff worked as the "personal trainer" for Putnam County District Attorney Adam Levy, Putnam ADA Laura Roberts contacted her office for instructions.

36. DA Adam Levy, who was away on vacation with his family, was contacted, confirmed his friendship with plaintiff, and immediately recused his office from participating in the S. rape investigation.

37. Arrangements were immediately made for sex crimes prosecutors from neighboring Westchester County to be available to assist in the remaining interview with S. until a formal special prosecution Order was issued from the Administrative Judge from the 9th Judicial District.

38. DA Levy, concerned that defendant Smith, who was running for re-election, would use this case to further his own political purpose, sent a series of text messages to ADA Chana Krauss, Putnam County DA's sex crimes prosecutor, in which he memorialized those concerns.

39. Putnam ADA Laura Roberts left the name and telephone number of the Westchester County ADA who was standing by to assist Tricinelli with S.'s interview and, following Levy's instructions, left the building .

40. Defendant Tricinelli contacted his office, advised senior investigator defendant Castaldo about Aunt B.'s statements and advised that DA Levy had

recused his office and that ADAs from Westchester were available to take over as necessary team members of the Putnam CAC MDT.

41.     Tricinelli and Fabiano interviewed S. without first contacting Westchester ADAs.  During her interview, S. stated:

i.      She met Alex while she was in Middle School, around the 6th grade.

ii.     Alex and her mother began dating and they lived together at 139 N Brewster Road.

iii.    S. "hated" Alex from the very beginning because her father had died in 2006 and S. thought it was too soon for her mother to be dating anyone.

iv.     On October 24, 2010, she came home from school, sitting in her room doing math homework, her mother was in the next room about 10 feet way, and her younger brother was downstairs at the neighbor's apartment.

v.      Her math teacher at time was Mrs. Starr.

vi.     Alex offered to help her with math homework, S said she didn't need help, Alex became enraged, "grabbed her throat and started choking her" to the point she could not breath.

vii.    S kicking her legs, clawing at Alex's arm, and struggled for 5-10 minutes as he "tried to choke me out" and take her pants off.

viii.   Alex forced her legs a part and was "inside of me".

ix.    She was raped for 3 more than hours from 7:15pm non-stop until 10:37pm.

x.    Alex held her down the entire time, choking her with his right hand and forearm.

xi.    S. was asked by Fabiano: "So for 3 hours he was inside of you the whole time?" and S. responded: "well, he pulled out, but not longer than like 10 seconds."

xii.    During the 3 hour rape, S. claimed that Alex ejaculated two times, first time he pulled out, the second time at the end.

xiii.    He left the room and said "tell anybody and I'll fucking kill you"

xiv.    As he left her room, S. "tried to get up and run after him but couldn't move for a really long time… from waist down, pretty much paralyzed" for about 1 hour 30 minutes. "I could not move".

xv.    S. was asked "were you bleeding?" and she responded "like a puddle on the bed"

xvi.    When S. finally got up, she went to her mother's room, about 10 feet away from hers, woke my mom up and told her what happened.

xvii.   S said her mother did not believe her.

xviii.  Fabiano asked if S. showed her the bloody sheets on your bed?

xix.    S responded; "no, they were in the wash."

xx.     Tricinelli took over the questioning and S said, again, that as Alex left her bedroom, she looked at the alarm clock on her nightstand and it said 10:37pm, that's how she knew the rape lasted over 3 hours.

xxi.    S said that first thing she did after getting up from being paralyzed for 1 hour and 30 minutes, was put her sheets in a ball, put them in a hamper, and put them by the door, that's when she went to wake up her mother, who said "why do you have to lie?"

xxii.   S. said that after her mother accused her of lying; she went to check on her brother, who was sleeping in his bedroom. After checking on her brother, and just moments after being unable to move from being paralyzed, S. took her bloody and balled up sheets, walked down the hallway in her home, went outside the back deck, walked down a steep wooden exterior staircase from the second floor to the garage, opened the door to the garage, walked inside, put her bloody balled-up sheets in the laundry and washed them.

xxiii.  "So, like the next morning, when I would have showed [my mother] my sheets, they were already washed..."

xxiv.   S. told Tricinelli about her knowledge of Alex's past employment as a camp counselor at Green Chimney's and how he used to live with a girlfriend of S.'s at the camp, that was owned by Lester family and run by man named Duncan.

xxv.   S. said she went to school the next day, but couldn't walk right. She said she had knee problems anyone, so people wouldn't have noticed. S. said she told her ex-boyfriend, Anthony Marinelli, about the rape in October 2012. He was the first person she told after her mother, and then she told Kenny Mitchell. Tricinelli, having recognized that it was very unlikely for any man to engage in sexual intercourse for 2 straight hours, ejaculate, then wait 10 seconds and resume the forcible rape, tried to get S. to change her story about the times and began suggesting answers that would appear more reasonable.

xxvi.   Tricinelli asked S. whether she had any marks on her after this vicious and violent 3 hour continuous rape where Alex choked her neck and forced his forearm into her throat. S said "no".

xxvii.   S said she was on cheerleading team during this period of time and stayed at the apartment Alex kept in Connecticut with her friend Sarah prior to a competition.

xxviii.   S. said she was injured while cheerleading and had had "numerous concussions".

xxix.   S said that the reason she called Kenny Mitchell and threatened to hurt herself, was because Ryan Belleshein's ex-girlfriend posted something "stupid" on line about S., said she was "ugly."

xxx.   S said the "tweet" didn't bother her; instead, her Aunt B's reaction to it upset her.  S. said her aunt B., after seeing the comments from a girl about S., called S. a "whore".

xxxi.  S said that on 2/25/13, she met with her school social worker, Henrietta Lodge, and told her about the rape.

xxxii.  S. said her rape allegation, would be a "he said she said, and "I'm sick and fucking tired of not being believed." "When I told my aunt B. [on 3/7/13), she said she didn't believe me either."  S said that her who family will also know she's lying.

xxxiii. S. then said she told 3 guys about the rape – Ryan Belleshein, Kenny Mitchell, and Anthony Marinelli.

xxxiv.  S. admitted she denied being raped when questioned by her aunt B in October 2012.

xxxv. On 3/11/13, when she went to PHC for psychiatric exam, it was after her aunt B "made me feel like a whore" because she was holding herself out to be together with boys from school on the internet and girlfriends were getting upset, and after a friend of hers committed suicide, that she threatened to kill herself, it had nothing to do with any rape.

xxxvi.  S then said 99% of her family hated Alex.

xxxvii.  As for S's objectively unbelievable story, Tricinelli told her: "once the words are out there, we can't take them back".

42.  In January 2008, Adam Levy commenced his first term as the elected District Attorney of Putnam County.

43.  Between 2002 and 2012, plaintiff worked as a personal fitness trainer.

44.  In or around 2006, plaintiff began training Levy, both at a local gym and at the latter's home.

45.  During this time, unbeknownst to Levy, plaintiff Hossu had over-stayed his visa in the United States.

46.  As plaintiff and Levy became better acquainted, the former began occasionally staying in a guest room at Levy's home and eventually listed Levy's address for his mail and his driver's license.

47.  Concurrently, Hossu was romantically involved with several women, one of whom, Si., was S.'s mother.

48.  Hossu and S.'s mother lived together during some of the time Hossu trained Levy.

49.  Eventually, S.'s mother died from drug-related causes.

50.  S. then commenced living with her aunt, B., who became her legal guardian

51.  Before her mother died, S. had accused her of physically abusing her.

52. The Putnam County Sheriff's Department ["PCSO"] investigated the matter and found S. not to be a credible witness and closed the case.

53. In February 2013, S. accused Hossu of violently raping her on a date certain in October 2010.

54. S. had earlier made this accusation, but when challenged by Aunt B., denied any sexual assault occurred.

55. Those close to S. disbelieved the accusation when she made it in 2010 and 2013.

56. Presented with S.'s allegation through Deputy Sheriff Sutherland and his Sergeant, defendant Smith assigned the Captain of the Civil Division of the Sheriff's Department, defendant McNamara to supervise the rape investigation.

57. At the time defendant Smith made this assignment, he knew that defendant McNamara was not, and had never been, an investigator, had never investigated a child rape case or any other sexual assault case in 32 years as a police officer, had never attended any training concerning approved and appropriate tools to investigate child abuse allegations, was not a certified forensic interviewer and was unfamiliar with CAC or established protocols for sex crime investigations.

58. Defendant Smith's assignment of defendant McNamara to run this investigation also contravened an April 2008 report on the Putnam County Sheriff's Department handling of sex abuse allegations written by the New York State

Commission on Investigation [NYSCOI] and the inter-agency agreement with CAC.

59.  Defendant Smith assigned defendant McNamara to supervise this investigation because he trusted the latter to violate protocols, arrest innocent people and further his political agenda.

60.  Smith instructed his investigators to keep defendant McNamara apprised of their activities on the case and the progress of the investigation and told them to go to him for advice.

61.  Smith told senior investigator Castaldo to speak with McNamara about the case and that McNamara would brief him directly about the case.

ed.

62.  Based upon his prior involvement with S. and her mother [who had since died], Tricinelli believed her mother's response to S.'s accusation that plaintiff had raped her held "more significance" than in a usual case.

63.  During this phone call, Aunt B. told defendant Tricinelli that she was not sure that S. was telling the truth about the rape allegation and wanted to first speak with Pollack before doing anything.

64.  Defendant Tricinelli did not include Aunt B's statement in any police report.

65.  During the same conversation, Aunt B. told Tricinelli that S. was 'known to exaggerate."

66. During defendant Tricinelli's interview with her on March 13, 2013, Aunt B. explained that one reason she was not sure S. was telling the truth was that in 2012, when she asked S. about the alleged 2010 rape, S. denied that plaintiff ever touched her in an inappropriate manner.

67. During the same March 13, 2013 interview, Aunt B. told defendant Tricinelli that she had a second conversation with S. a week later and, again, S. vehemently denied that plaintiff sexually assaulted her.

68. On March 13, 2013, defendant Tricinelli asked S. what she wanted to see happen to plaintiff; she stated that she did not want any case to go forward and did not want plaintiff arrested.

69. During the same discussion, S. told defendant Tricinelli that plaintiff would never hurt anyone, but defendant Tricinelli and the other defendants disregarded S.'s wishes and forced her to proceed.

70. Faced with Levy's recusal from the investigation into S.'s allegations, on March 14, 2013, the Chief Administrative Judge for the Ninth Judicial District assigned the WCDAO as special prosecutor on the matter raised by S.

71. Thenceforward, WCDAO became part of the Multi-Disciplinary Team [MDT] of CAC.

73.  As members of the MDT, ADAs, criminal investigators and CPS personnel shared information and assisted each other pursuant to CAC's inter-agency agreement and various provisions of state Executive and Social Service law.

74.  Specifically, defendant Tricinelli coordinated all his activities with defendants ADAs Green and Borden, participated in regular meetings with defendants Smith, McNamara, Castaldo, Borden and Green and updated them on the investigation.

75.  On March 14, 2013, investigators inputted plaintiff's name and Levy's home address and obtained and noted details about Levy's house, cars and neighbors, though this had nothing whatsoever to do with their investigation of S.'s claim of forcible rape.

76.  The same day, PCSO investigators ran NYSPIN inquiry for plaintiff's DMV License and registration and his criminal history, which came back clean.

77.  On March 14, 2013, defendant Tricinelli interviewed Delefield since S. had stated that she told her about the sexual assault.

78.  However, Delefield denied that S. ever told her anything about any such assault.

79.  Likewise, the same day, PCSO investigators interviewed Marinelli, another person S. claimed she had told of the sexual assault.

80.  Like Delefield, Marinelli denied S. had made any such disclosure to him.

81.  Similarly, on March 14, 2013, PCSO investigators interviewed Ryan Belleshein to confirm that S. told her about the sexual assault.

82.  Belleshein stated that S. never mentioned this until recently, not when S. claimed she had told her.

83.  On March 15, 2013, investigators confronted S. with Marinelli's failure to corroborate her story of having disclosed to him plaintiff's alleged sexual assault.

84.  After learning of Marinelli's contradictory position, Tricinelli directed S. to contact Marinelli and get him to change his story.  Marinelli refused to do so.

85.  Marinelli's father then contacted Tricinelli and told him that S. was a "fucked up" kid and directed him off of his property.

86.  In light of the daily sharing of all information relevant to this investigation with defendant Borden, the WCDAO knew of these further repudiations of S.'s credibility.

87.  Defendants also interviewed Kenny Mitchell, S.'s most recent boyfriend, and he denied her claim that they broke up because he wanted to go further sexually than she did.

88.  On March 18, 2013, defendants Castaldo and Tricinelli had a phone conversation with defendant Borden and sought to convince him that plaintiff was living with District Attorney Levy.

89. By the following day, March 19, media attention was focused on the upcoming race for Putnam County Sheriff and, specifically, defendant Smith's response to opposition polling.

90. On March 19, 2013, though defendants Smith, McNamara, Castaldo and Tricinelli all knew that Hossu lived in Clocktower Commons, the PCSO investigators sought confirmation that Hossu had previously provided Levy's address as his own to Immigration, the United States Postal Service and DMV.

91. On March 19, 2013, defendants McNamara, Tricinelli and Borden met in Carmel and focused on whether they could establish that Hossu then lived at Levy's home; by this date, defendant Tricinelli knew that Hossu had not lived at Levy's residence for a long time.

92. Defendant Smith knew that his investigators were seeking to establish a link between Hossu and Levy and actively investigating where Hossu was living as of March 2013.

93. Defendant McNamara, Castaldo and Tricinelli all knew that where Hossu lived in 2013 was irrelevant to the rape allegation under review.

94. In furtherance of defendants' effort to connect Hossu to Levy, on March 19, 2013, a PSCO deputy stopped Hossu after plaintiff exited his place of employment and demanded to see his driver's license.

95.  Plaintiff produced his license, which carried Levy's address, and the responding deputy sheriff immediately reported this to defendant Castaldo.

96.  On March 19, 2013, under defendants Smith and McNamara's direction, PCSO surveilled Hossu, confirming that he and his girlfriend resided at Clocktower Commons.

97.  On the same date, while surveilling Hossu, defendant Tricinelli checked out Hossu's twitter account and wrote in a supplemental report that it included a post from December 2011, which stated that he was taking a two week vacation in Wyoming.  Again, this "fact" had nothing to do with the rape allegation, but defendant Tricinelli included it since it further connected Hossu to Levy, who Tricinelli knew had a home in that state.

98.  On March 20, 2013, defendant Tricinelli requested that another investigator conduct a dump of S.'s phone in search of a message she allegedly sent Marinelli.

99.  The dump did not recover any such message, but showed that S. had exchanged sexually explicit messages with several boys at her school before she made any accusation to social worker Lodge about Hossu.

100.  This revelation, which preceded plaintiff's arrest, contradicted S's claim, made just the day before to defendant Borden and witnessed by defendants Castaldo and Tricinelli, that she was broke up with Kenny Mitchell because he

pressured her to go further sexually than she wanted and exploded S.'s explanation for her sudden accusation against Hossu, further unraveling her credibility.

101. S. had told Hodge that Mitchell's sexual pressure caused her to re-live the rape to which plaintiff allegedly subjected her.

102. However, her own emails show she was, and had been sexually active with other boys, eliciting a strong negative response from other girls in her school.

103. S.'s need to distract attention from her own conduct caused her to fabricate the serious accusation against plaintiff.

104. On March 20, 2013, defendant Tricinelli sought confirmation as to the address from which plaintiff's phone was registered.

105. On March 20, 2013, defendant Castaldo briefed defendant McNamara, updating the "rape" investigation; during the briefing, defendant Castaldo highlighted activities which did NOT confirm any crime, but, rather Hossu's use of Levy's address for mail and on his driver's license.

106. On March 20, 2013, defendant Smith learned that a reporter for the *Journal News* intended to interview District Attorney Levy the following week about the many problems he had observed in and experienced with the Sheriff's Office.

107. As of March 20, 2013, defendants Smith, McNamara and Tricinelli had custody and access to prior incident reports by the PCSO showing the following: (a) a September 29, 2010 accusation by S. against her own mother for assault; (b)

an April 27, 2011 incident during which deputies responded to 1201 Eagle Ridge Road for a "family dispute" involving plaintiff, Siobhan, S.'s mother, and S. and (c) a July 10, 2012 incident during which PCSO deputy sheriff Hunsberger responded to plaintiff's residence, at 221 Clocktower Commons, following plaintiff's call after Siobhan broke into his apartment.

108.  On the evening of March 20, 2013, defendant Tricinelli took a statement from S. in which she provided her birth date, allowing Tricinelli to determine that she was 13 years of age on the date she gave for the rape, October 24, 2010.

109.  Following his interview with Aunt B. and S., defendant Tricinelli informed the other defendants of the contents of the interview and planned follow-up activities.

110.  Paperwork prepared by one team member was shared with all others.

111.  Likewise, the activities of those defendants directly conducting the investigative tasks relating to the case, were made known to each defendant through regular meetings, emails and phone contact.

112.  Thus, the misrepresentations made in investigative reports were known by all defendants, none of whom acted to correct/cure these reports.

113.  Under defendant McNamara's supervision, defendants Castaldo and Tricinelli falsified official police reports, made material misrepresentations to the Paterson Town Judge who issued an arrest warrant for plaintiff on March 20, 2013, violated

23

state law and protocols concerning the investigation of child abuse allegations,

attempted to conceal their conduct by filing police reports which omitted material

facts, included immaterial matters in police reports to support defendant Smith's

collateral purpose for arresting plaintiff - to further his political agenda and

enhance his re-election bid and disregarded explicit written recommendations from

the NYSCOI report.

### THE WESTCHESTER COUNTY DA'S OFFICE DIRECTED THE PRE-ARREST INVESTIGATION AND AUTHORIZED HOSSU'S ARREST ON MARCH 20, 2013

114.  Defendants Smith, McNamara and Castaldo claim to have taken direction

from the WCDAO as to whether probable cause to arrest plaintiff existed.

115.  According to defendants Smith and McNamara, the WCDAO directed the

investigation from March 14, 2013 forward and the investigative strategies they

and their staffs employed were under the control and direction of the WCDAO.

116.  According to defendants Smith and McNamara, on March 19, 2013,

following his interview of S., defendant Borden told defendant McNamara that he

found S. credible and believed her accusation.

117.  In fact, a supplemental report prepared the same day by defendant Tricinelli

states the opposite - that on that very day, defendant Borden expressed concern that

probable cause might well NOT EXIST for plaintiff's arrest.

118. According to defendant McNamara, during the late afternoon of March 20, 2013, he and defendants Castaldo and Tricinelli and investigator Nalbone conversed by phone with defendant Borden and Heidi Mason, another Westchester County Assistant District Attorney.

119. According to defendant McNamara, during this conversation, defendant Borden and Mason gave the green light for plaintiff's arrest.

120. According to defendant McNamara, this "green light" was very significant because his office deferred to the Westchester County DA's Office to authorize the arrest and did not themselves evaluate the quality or quantity of evidence to establish whether probable cause for plaintiff's arrest did or did not exist.

121. Before plaintiff's arrest, defendant McNamara advised defendant Smith that the WCDAO had authorized plaintiff's arrest.

122. On the basis of these accounts, plaintiff alleges that his arrest was authorized by defendants Green and Borden, who reported to and took direction from Green.

## PUTNAM DEFENDANTS' INVOLVEMENT IN HOSSU INVESTIGATION AND ARREST BEFORE MARCH 20

123. Before plaintiff's arrest on March 20, 2013, defendants McNamara, Castaldo and Tricinelli all believed the investigation into S.'s charge was incomplete.

124. Indeed, according to defendant McNamara, the "rush" to arrest plaintiff derived from his investigators' concern that plaintiff had been "tipped off" to the

allegations S. had made and would flee the jurisdiction rather than face the serious charge of raping a minor.

125.  However, despite this claim, defendant McNamara's investigators had no basis to believe that Levy or anyone else was attempting to influence the Hossu investigation or to tip Hossu off in any way as to its existence.

126.  The evidence that Hossu had been "tipped off" consisted of McNamara's claim that, on March 20, 2013, plaintiff parked his car in a different area of Clocktower Commons, where he resided than he parked previously.

127.  However, PCSO Investigator Nalbone, who had been dispatched to check on whether Hossu's car was parked there, reported to Castaldo that Hossu's car was pretty much in the same place as it had been the night before.

128.  During their investigation of the alleged rape of S. by plaintiff, defendants McNamara, Castaldo and Tricinelli focused instead on establishing the relationship between plaintiff and Levy, Smith's political adversary, though this relationship had no bearing on whether Hossu did or did not commit the alleged crime some 30 months earlier.

129.  Once defendant Smith learned that state motor vehicle and US Postal Service records showed that Hossu had used Levy's address as his own, plaintiff was arrested.

130.  By this time, no defendant had obtained any corroboration that plaintiff had

violently raped S. and, instead, had serious doubts that her story was credible.

131.  Indeed, prior to plaintiff's arrest on March 20, 2013, members of the MDT

possessed police reports, videotaped interviews, signed statements, CPS records

and information obtained during face-to-face witness interviews which detailed a

long history of mental health issues and prior occasions where S. lied to family,

friends, the police and school officials about assaults which had never occurred.

132.  Indeed, in arresting plaintiff, defendants intentionally ignored numerous

warning signs that S. was not credible or believed to be credible by those closest to

her including, but not limited to the following:

a)   Lodge learned of S.'s allegations on February 28, 2013, but did not report the

allegations to CPS or law enforcement;

b)  Lodge was aware of the prior false claim S. had advanced against her own

mother and Aunt B. told Lodge that S. was prone to exaggeration;

c)  On March 7, 2013, Aunt B. told Lodge that S. had emotional problems and the

minor was taken to Putnam County Hospital;

d)  On March 11, Aunt B. told deputy Sutherland that S. had told her late mother

about the alleged sexual assault and her mother had accused the young woman of

lying;

e)  On March 11, B. also told Sutherland that she first learned of the allegation on March 7, but took no action because she first wanted to speak with S. and Pollack to ensure that S. was telling the truth;

f)  The same day, investigator Nalbone advised defendant Castaldo that S. had emotional problems;

g)  The following day, in a face-to-face meeting, Nalbone told defendant Castaldo that S was emotionally troubled;

h)  On March 13, defendant Tricinelli interviewed Aunt B. who questioned S.'s credibility and related that, in October 2012, S. had expressly and categorically denied that plaintiff ever sexually assaulted her;

i)  During this same interview with Tricinelli, Aunt B. told him that the family had long been involved with CPS;

j)  defendant Tricinelli himself knew firsthand about these credibility issues as he was the investigating officer who closed the September 2010 case because he found no injuries consistent with S.'s claim that her mother had assaulted her;

k)  on March 14, 2013, Delefield, Marinelli and Bellshein all gave statements which contradicted S.'s claim that she had disclosed the "rape to them;

l)  Kenny Mitchell denied that he ever had pressured S. to have sex with him.

133.  Contrary to the account offered by defendant McNamara, Smith's close aide, that the impetus for Hossu's arrest was the approval by defendants Borden and

Mason, Nalbone has sworn that the decision to arrest plaintiff was made during a discussion between defendants McNamara, Castaldo, Tricinelli and him on March 20, 2013.

134. This decision was made because those assembled claimed they could not think of any other evidence they might develop and feared Hossu was a flight risk based upon his "recent" change of address.

135. In fact, as is shown herein, the investigation was just commencing and there was much other evidence which needed to be reviewed.

136. And, as of that date, plaintiff had not recently moved, but rather, he had been living in Clocktower Commons for almost a year and PCSO had responded months earlier to calls from this location by him.

137. According to Nalbone and contrary to defendant McNamara and Smith's claims, the decision to arrest plaintiff was not informed or approved by the WCDAO defendants, but, rather, was an internal sheriff's department decision informed not by probable cause or a belief that the same existed, but, rather by political motivation.

138. On March 13, 2013, defendants McNamara and Castaldo advised defendant Smith that S. had accused plaintiff of rape that plaintiff was a close personal friend of District Attorney Levy and that Levy had indicated that his office was going to recuse itself from the case.

139.  As of March 13, 2013, defendants McNamara, Castaldo and Tricinelli learned that, on March 11, 2013, doctors, including a psychiatrist, psychologists and a social worker, had evaluated S. at the Putnam Hospital Center.

140.  As of March 13, 2013, defendants McNamara, Castaldo and Tricinelli knew that S.'s late mother and her aunt and current guardian, B., had accused her of lying about this alleged rape and challenged her credibility.

141.  As of March 13, 2013, defendants McNamara, Castaldo and Tricinelli knew that, in October 2010, while a student at the Henry H. Wells Middle School, S. reported that her own mother had assaulted her, that defendant Tricinelli investigated this complaint, took a sworn written statement from S. and, with defendant Castaldo's approval, closed the case because of serious questions concerning S.'s credibility and an inability to corroborate her account of a physical assault.

142.  As of March 13, 2013, defendants McNamara, Castaldo and Tricinelli also knew that CPS had also investigated S.'s assault claim against her mother and closed it as unfounded after determining that S. was not credible.

143.  As of March 13, 2013, defendants McNamara, Castaldo and Tricinelli also knew that, in the fall 2012, S.'s aunt B. had asked her whether plaintiff ever touched her in an inappropriate of sexual manner and that S. had twice adamantly denied this.

144. As of March 13, 2013, defendants McNamara, Castaldo and Tricinelli also knew that, on March 7, 2013, when S.'s aunt learned from a school therapist that S. was claiming plaintiff had violently raped her, S.'s aunt replied that S. was known to exaggerate.

145. As of March 13, 2013, defendants McNamara, Castaldo and Tricinelli all also knew that, despite being informed of S.'s allegations, both the school social worker and S.'s aunt did not report the allegations to CPS, though the school social worker was a mandated reporter who could only fail to report if she concluded that S.'s story was not credible.

146. Despite his knowledge of the information set forth in paras. 139-145, *supra.*, defendant Tricinelli intentionally omitted from police reports any information that called S.'s credibility into question.

147. Before he interviewed any of the professionals who had evaluated S. on March 11, 2013 at the Putnam Hospital Center, and without speaking to her therapist, defendant Tricinelli asked S. to make a controlled call to plaintiff.

148. Investigator John Matrician was a witness to the controlled call, which was made to plaintiff on March 13, 2013, and he concluded that plaintiff sounded truthful when he denied S.' sexual assault claim.

149. Thereafter, on the basis of this conclusion, Matrician expressly questioned defendant Tricinelli about S.'s credibility.

150.  After the controlled call yielded no confirmation of S.'s allegation, PCSO investigators accessed plaintiff's Facebook account and copied a photo of plaintiff and current girlfriend, Jen Bartlett, but did not note that, on January 14, 2013, plaintiff had removed S. as a Facebook friend because he did not want her to know that he was involved with Bartlett.

151.  The same investigators failed to document what was clear from S.'s Facebook: that in the weeks before she made false accusations against plaintiff, she was being accused by female peers of being a "whore" and a "slut" for engaging sexually with their boyfriends.

152.  On March 20, 2013, defendants obtained a warrant for plaintiff's arrest and used District Attorney Levy's address as the address of the warrant's subject.

153.  In fact, as they knew exactly where Hossu lived, defendants deployed officers to arrest plaintiff at his residence at Clocktower Commons and never made any effort to arrest him at Levy's home.

154.  At plaintiff's arraignment, he provided the Court his 221 Clocktower Commons address, but, in open court, PCSO deputies insisted that he provide his mailing address, which associated him with Levy.

155.  At plaintiff's arraignment, defendants Castaldo and Tricinelli lied to the Court when they claimed to have a "bail recommendation" from the WCDAO and a demand that Hossu forfeit his passport.

156. On March 21, 2013, defendants dispatched Matrician to get a CD of plaintiff's arraignment from the Paterson Justice Court.

157. According to defendant Smith, obtaining such CDs was not protocol and was done here to hide the fact that Hossu had given his address at Clocktower Commons to the Court when asked where he lived.

158. The plaintiff's case was handled in an unusual way because, contrary to protocol in a sexual assault case, defendants arrested Hossu and publicly accused him of a heinous crime before making any effort to collect and analyze physical evidence.

159. At the time of plaintiff's arrest, serious questions existed about S.'s credibility and defendants lacked any corroboration that plaintiff had raped S. two and one-half years earlier.

160. No medical corroboration had been uncovered, no phone records had been obtained to corroborate this in any way and no admissions had been obtained from plaintiff to this effect.

161. Likewise, despite the importance of doing so in light of the serious questions raised by March 13 about S.'s credibility, defendants failed to perform any meaningful case enhancement before requesting the arrest warrant, to wit: interviewing S.'s therapist, Joanne Pollack, Ms. Biagi, S.'s school social worker during middle school or any of S.'s teachers, cheerleading coaches, counselors or

school administrators from 2010; obtaining school attendance records and school nursing records from October 2010, conducting forensic medical exam and obtaining pediatrician's records, S's cellphone records or interviewing any other children who lived with plaintiff.

162.  Instead, the investigative focus related to showing a connection between Hossu and Levy, a connection the Sheriff and his appointed subordinates developed and intended to exploit for another motive - to publicly associate Levy with this alleged "child rapist" and thereby derail support in the Republican party convention and any primary for Christopher York, a candidate Levy supported against Smith for Sheriff in 2013.

163.  The defendants collectively did not present the Justice Court with an Affidavit supporting the arrest warrant in this case.

164.  Instead, they later prepared an Affidavit purportedly [but not in fact] used for the purpose of procuring the warrant; that document is not signed and includes events which occurred AFTER the issuance of the arrest warrant.

165.  The arrest warrant distorts or omits numerous matters, including (a) the March 20 conversation between Deputy Sheriff Hunsberger and plaintiff, during which the latter denied the allegations, (b) the numerous bases to doubt S.'s allegations and (c) the actual lack of corroboration provided for S.'s allegations by

witnesses listed in the arrest warrant, namely Bennesheim, DeLeo, Lodge, B, Mitchell.

## THE DEFENDANTS' POST-ARREST CONDUCT CONFIRMS THEIR MALICIOUS MOTIVE IN ARRESTING & PROSECUTING PLAINTIFF

166.  After plaintiff's arrest, in a press release, defendant Smith identified plaintiff as residing at the Levy residence.

167.  This was a knowingly false representation since defendants all knew that Hossu was and had been living at Clocktower Commons, a fact that had been confirmed by the following: (a) PCSO agents' observations during recent visits to that living space, (b) plaintiff was arrested at his apartment following surveillance at the same location and (c) during the week long investigation which preceded plaintiff's arrest, there was no evidence developed showing that Hossu actually then lived at the Levy residence, no surveillance was ever conducted at or near the Levy residence to confirm that Hossu might be living there and there was no good faith basis for the belief that he was then doing so or had been doing so in October 2010.

168.  On March 23, 2013, Putnam County Executive used a slide created by Levy showing the increase in overtime at the Sheriff's Office.

169.  Defendant Smith reacted angrily and stated, "I'm locked, cocked and ready to go to battle."

170.  This comment reflected defendant Smith's response to criticism: revenge.

171.  Defendant Smith's politicization of plaintiff's case and his pre-judgment notwithstanding the absence of any confirmation were encapsulated by the following quote he released on March 26, 2013: "I believe my service as Sheriff, as protector of people, is totally in keeping with my Christian faith. Protecting rights of victims, especially a defenseless little girl, is in full accordance with Judeo-Christian principles."

172.  On March 28, 2013, defendants McNamara, Castaldo and Tricinelli met with ICE agent Applebaum and sought further to connect plaintiff and Levy and bring embarrassment to District Attorney Levy for his alleged association and harboring of a suspected illegal alien.

173.  In subsequent contact with Jen Bartlett, ICE agents sought to better understand Hossu's relationship with Levy and the Levy household, though this, of course, had nothing to do with any alleged sexual misconduct by plaintiff.

174.  Following Hossu's arrest, defendants collectively engaged in the following investigative activities before seeking plaintiff's indictment from a Grand Jury:

a)  they interviewed Adam and Lori Levy's daughter, E., and found nothing confirmatory of any sexual abuse or misconduct by plaintiff;

b)  they had S. attend a forensic medical examination [defendant Green attended as well], which revealed no abnormalities, as might well be associated with a violent three hour sexual assault, as S. contended had occurred;

c)  they received information from CPS which demonstrated that S. had expressed ongoing hostility toward plaintiff dating to early 2009 and

d)  they repeatedly rebuffed efforts by plaintiff's attorney to obtain *Brady* material, to have witnesses presented to the Grand Jury and to discuss the merits of the case.

175.  At the time they presented to the Grand Jury, defendants Green and Borden had failed to engage in basic investigative tasks which any reasonable district attorney confronted with serious doubts concerning the credibility of an alleged victim, would have undertaken before making an arrest for a crime as serious as "child rape"; for instance,

a)  they had not sought, obtained, seen or reviewed S.'s phone records and did not receive them until early August 2013;

b)  they had not reviewed S.'s school attendance records, which actually show she attended school on Monday, October 25, 2010 and every other day that week;

c)  they never interviewed S.'s teachers, social worker or school nurse assigned to her in October 2010;

d)  they never reviewed records of S.'s after school activity, cheer leading;

e)  they did not receive or review her pediatrician's records for the periods before and after October 24, 2010, and

f)  they failed to interview the social worker who worked with S. in February-March 2013.

176.  On October 10, 2013, months after obtaining an indictment based on S's uncorroborated testimony that plaintiff raped her on October 24, 2010 for three straight hours, defendant Green confronted S. with her own phone records which showed that she was on the phone for 43 minutes during the time she claims the rape was occurring.

177.  Defendant Green's desire to shield the truth from plaintiff and maliciously prosecute him is best demonstrated by his failure to engage in standard and necessary investigative steps before proffering an alleged victim as credible to a Grand Jury.

178.  Defendant Green's desire to deprive defendant of due process of law is demonstrated as well by the following evidence:

a)  he failed to advise the defendant/his counsel of the results of the forensic medical report before the Grand Jury proceeding;

b)  he failed to advise the defendant/his counsel of the CPS reports which unfounded S.'s September 30, 2010 accusation against her mother and, on August 12, 2013, when he provided these to the Court for *in camera* review, he claimed these records had no bearing on the alleged victim's reliability or credibility;

c)  he claimed in early August 2013 that he could not obtain S.'s phone records;

d) he finally received these records several weeks later, but ignored their clear

implication - that S. had lied when she claimed she had been raped for three

straight hours by plaintiff on October 24, 2010;

e) he disallowed the testimony of Kenny Mitchell which, he knew, contradicted

S's claims that she did NOT DISCLOSE the alleged rape to him.

179.  Following trial of this matter, plaintiff was fully exonerated by a jury, several

of whose members publicly asked how he could ever have been indicted in the first

instance.

180.  As a consequence of his arrest, plaintiff was incarcerated for more than one

year awaiting trial.

181.  Said incarceration was a direct consequence of the blatantly and intentionally

inadequate investigation in which all defendants engaged and the decisions by

defendants Greene and Borden to conceal with the court and defense counsel the

tremendous volume of *Brady* material which exonerated plaintiff and called into

question S.'s credibility.

182.  Plaintiff was likewise indicted only because those initiating his prosecution,

namely defendants Smith, McNamara, Castaldo and Tricinelli, suppressed the truth

about the profound doubts those closest to S. had about her credibility, failed to

analyze available physical and medical evidence which entirely refuted any case

against the plaintiff and, instead, sought to associate Hossu with Levy for political

advantage.

183.  Plaintiff's arrest represented policies and practices adopted by defendant

Smith, as the chief law enforcement official in Putnam County and the county's

final policy-maker in these regards, which devalued the constitutional rights of

potential defendants in criminal cases.

184.  Those policies and practices include, but were not limited to, the following:

[a] repeatedly making arrests prematurely, based upon insufficient probable cause,

to further defendant Smith's political objectives; [b] use of the media to publicize

such arrests and to create a prejudicial environment for arrestees before

presentation of serious criminal matters to the Grand Jury and [c] the preparation

of misleading and incomplete investigative reports which, upon their disclosure,

intentionally failed to include exculpatory material and information and thereby

deprived potential defendants of their right to know of such information.

185.  In this instance, defendants Smith, McNamara, Castaldo and Tricinelli

utilized all of these techniques and their use of the same was observed and known

by defendants Green and Borden who failed to publicly insure that, as a defendant,

Hossu was not prejudiced by defendant Smith's press releases of March 21 and 22,

2013.

186.  In these releases, defendant Smith publically pre-judged the case against plaintiff.

187.  In these releases, defendant Smith associated plaintiff with Levy and accused Levy of interfering in the criminal investigation to protect his friend Hossu.

188.  This portrayal was materially false and known to be materially false by all other defendants.

189.  As prosecutors, defendants Green and Borden had a specific duty to correct the public record and insure that the public was not left with the distinct impression that District Attorney Levy had interfered with the investigation.

190.  Fulfilling this duty was critical to assuring that plaintiff receive fair consideration by the Grand Jury and not be publicly perceived as having sought or been advantaged by the improper intercession during a criminal investigation of DA Levy.

191.  Yet, despite knowing that Levy had not interfered in any way with the criminal investigation and, instead, had immediately recused his office from the investigation, had no contact with plaintiff between March 13 and March 21, 2013 and did nothing either directly or indirectly to interfere with the investigation, defendants Borden and Green never did publicly correct defendant Smith and make clear that Hossu had had no advantage of interference in the investigation of his case from District Attorney Levy.

192.  Defendants' collective failure to correct the record fomented the public

perception defendant Smith hoped to flourish – that Hossu was the unfair recipient

of the benefit of unspecified wrongful interference by Levy during the criminal

investigation.

193.  As a consequence of defendants' wrongful conduct, plaintiff suffered undue

incarceration, profound humiliation and public embarrassment, loss of wages and

economic opportunities and standing in the community.

## CAUSES OF ACTION

194.  Plaintiff re-states and incorporates paras. 1-193 as if fully re-written herein.

195.  By proceeding against plaintiff for an improper purpose, that is political

advantage, defendants engaged in abuse of process contrary to the due process

clause of the Fourteenth Amendment as made actionable against them by 42

U.S.C. section 1983.

196.  By falsely arresting plaintiff, though they knew they lacked probable cause,

defendants all violated his right to due process of law in violation of the Fourteenth

Amendment as made actionable against them by 42 U.S.C. section 1983.

197.  By maliciously initiating this proceeding despite the absence of probable

cause, by fabricating police reports and presenting a wholly slanted view of

incomplete information and by failing to conduct a good faith investigation,

defendants Smith, McNamara, Castaldo and Tricinelli maliciously prosecuted

plaintiff in violation of the due process clause of the Fourteenth Amendment as made actionable against them by 42 U.S.C. section 1983.

198.  By intentionally denying plaintiff a fair trial by manufacturing false evidence and withholding exculpatory evidence, defendants violated plaintiff's right as protected by the due process clause of the Fourteenth Amendment as made actionable against them by 42 U.S.C. section 1983.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff prays that defendants be ordered to pay to plaintiff the sum of $15,000,000 in compensatory damages and $30,000,000 in punitive damages as well as his reasonably incurred attorney fees and costs.

Respectfully submitted,

MICHAEL H. SUSSMAN [3497]

SUSSMAN & WATKINS
PO BOX 1005
1 RAILROAD AVENUE, SUITE 3
GOSHEN, NEW YORK 10924
(845)-294-3991

Counsel for Plaintiff